# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| KENYA DANTZLER, ) | |
| ) | Judge Joan B. Gottschall |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Case No. 11 CV 1476 |
| CITY OF CHICAGO, Chicago Police Officers ) | |
| RONALD JENKINS, and CALVIN RIDGELL JR., ) | |
| and United States Marshal PHILLIP LEIBAS JR., ) | |
| ) | |
| Defendants. ) | |

## **OPINION & ORDER**

Plaintiff Kenya Dantzler brought a complaint alleging violations of her constitutional rights after a search was conducted of her home for a fugitive. Counts II and IV are against Deputy U.S. Marshal Phillip Leibas, Jr. for illegal search of Dantzler's home and unreasonable seizure of her person, respectively. Additional counts pertain to the other defendant officers ("the officers") and the City of Chicago. Defendant Leibas has moved for summary judgment on Counts II and IV pursuant to Federal Rule of Civil Procedure 56. Because there remain genuine disputes as to material facts, the motion is denied.

### I.    BACKGROUND

Because material disputes of fact exist as to the critical issue of whether Dantzler either expressly or impliedly consented to the officers' entry, and because this issue prevents summary judgment in favor of Leibas, the court reviews the facts relevant to consent. The following facts are undisputed unless otherwise noted. On March 5, 2010, Leibas was in charge of a team seeking to execute an arrest warrant for a man named Antonio Thompson for the crime of felon

in possession of a weapon. The officers had information that Antonio Thompson might be in Dantzler's house. Dantzler, her husband and their child lived on the first floor of 6816 S. Campbell in Chicago, a two-flat apartment building owned by her mother, Michelle Bouquet. Though Leibas had an arrest warrant for Thompson, Leibas did not have a search warrant for Dantzler's home.

On the morning of March 5, 2010, Leibas and approximately five members of his team approached the front door of 6816 South Campbell, while two Chicago police officers went around to the back of the residence to observe the rear of the building. Dantzler and her child, along with two other young children Dantzler was babysitting, were asleep. Dantzler was awakened in her bedroom to loud banging on her front door. Dantzler got out of bed and proceeded to the front door of the residence, opened the door, and saw five or six marshals.

Leibas communicated to Dantzler that the officers were looking for Antonio Thompson. Dantzler replied that she did not know a person by that name. Dantzler knew Antonio Thompson by the nickname "Teck." Leibas then showed a picture of Thompson to Dantzler and she recognized him as Teck. Dantzler stated to Leibas that she didn't know where Thompson was and that he didn't live at 6816 South Campbell.

Several facts are disputed. First, the parties dispute the location of the officers and whether the officers had their guns drawn during the conversation. Dantzler testified that the officers were standing in an interior hallway vestibule banging on the front door of her apartment, which was an interior door within the two-flat. Leibas testified that the officers were standing on the porch and Dantzler was inside the building. Dantzler testified that the officers had "big . . . machine-like guns" and that they were holding the guns with their two hands up by

2

their chests.[1] (P.'s App'x Exs., ECF No. 59 (Ex. 2, Dantzler's Dep. at 13).) Leibas testified that he had only a handgun that day, and that it was not in his hand at the time he knocked on the door. At the time of his deposition, Leibas testified that he did not know if any of the officers had guns out while he was knocking or talking with Dantzler. Another defendant officer, Officer Jenkins, testified that while Leibas and Dantzler were talking, Jenkins and two or three other officers were on the porch, with their guns out and unholstered.

Second, the parties dispute whether more was said before the officers entered. Leibas testified that "I asked[ed] if we can come in to look for Mr. Thompson to see if he's here, and she said no." (Leibas's Mot. Summ. J. Ex. C (Dep. of Leibas at 46).) Leibas testified that next, "I explained to Ms. Dantzler that we just need to come in, look for Antonio Thompson. If he is not here, we won't be back and bother her again. . . . We need to verify that Antonio Thompson is not here. (*Id*.) Leibas testified Dantzler said "Yes, come in." (*Id*.) Dantzler testified that neither Leibas nor any of his fellow officers asked for permission before entering Plaintiff's home. Dantzler testified that the officers just walked in without asking.

The parties agree on the remainder of the facts, except where noted. Dantzler testified she was shocked, and for this reason backed away from the door into her apartment. (P.'s App'x Exs., ECF No. 59 (Ex. 2, Dantzler's Dep. at 15).) As Dantzler moved back, Leibas and his team moved into her apartment. Dantzler's baby began to cry in a bedroom of the apartment. Leibas and at least one other officer escorted Dantzler to attend to the baby. The officers then searched the home. Dantzler never asked the marshals to leave her home. Though the exact timeline is

---

[1] Dantzler argues in her response that the officers' guns were pointed in her face, but her deposition testimony indicates only that the guns were large (taking two hands to hold), and that the officers had the guns unholstered, with their hands near their chest. Dantzler's testimony at the deposition involved her giving a physical demonstration of the position in which the guns were held, which may have supported her assertion the guns were pointed in her face; the transcript alone does not support that assertion.

disputed, the parties agree that the phone in the house rang repeatedly, but Dantzler was not allowed to answer the calls. Dantzler was allowed to go to the kitchen to prepare food for the children. Leibas claims (and Dantzler disputes) that drugs were found in plain view in the house. Two residents (but not Dantzler) were eventually arrested. The officers then left.

## II. LEGAL STANDARD

Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009). The court construes all facts and makes all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate when the nonmoving party is unable to establish the existence of an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

## II. ANALYSIS

### A. Entry and Search

Though the parties disagree about whether Dantzler consented to the officers' entry, Leibas argues that there is no material dispute of fact precluding a finding that Leibas reasonably inferred consent to enter and search Dantzler's home and reasonably detained Dantzler for his team's safety and until a party responsible for the discovered drugs was identified and arrested. Specifically, Leibas argues that Dantzler's step back into her home after opening the door and her failure to object to their presence or search should reasonably be construed as consent. Leibas also argues that even if Dantzler's actions did not imply consent, his erroneous belief that her actions implied consent was reasonable and therefore entitled to qualified immunity. Dantzler argues that her actions did not imply consent, or, if they did, that any implied consent was

negated because of the coercive and intimidating circumstances – particularly the officers' guns and their presence inside her vestibule when she opened the door.

The officers' entry presents two related questions. First, did Dantzler's actions indicate consent to the search? Second, if so, was the consent vitiated by the coercive circumstances in which it was given? The Seventh Circuit has directed that these questions be addressed sequentially. *United States v. Griffin*, 530 F.2d 739, 743 (7th Cir. 1976).

1. Manifest Consent

An arrest warrant does not give officers authority to search a home of a third party, even if the officers have probable cause to believe that the subject of the warrant is in the home. *Steagald v. United States*, 451 U.S. 204, 220-21 (1981). A search of a home conducted without a warrant is per se unconstitutional, subject to limited exceptions including consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Explicit verbal consent to enter a dwelling is not necessary to constitute consent for the purposes of the Fourth Amendment. *United States v. Villegas*, 388 F.3d 317, 324 (7th Cir. 2004). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). In determining whether an individual's actions manifested consent, the Seventh Circuit has considered both the exchange that occurred before the officers entered, and whether an individual's actions during the search were consistent with consent. *Griffin*, 530 F.2d at 743 n.3; *Gerald M. v. Conneely*, 858 F.2d 378, 384 (7th Cir. 1988). The Sixth Circuit has described the test for manifesting consent as whether "[a]ny ordinary caller, under like circumstances, would understand assent to have been given." *United States v. Carter*, 378 F.3d 584, 588 (6th Cir. 2004).

Taking all facts in the light most favorable to Dantzler, the officers behind Leibas had their guns drawn. Dantzler testified that she opened the door and backed up "because I was shocked" the sight of them. P.'s App'x Exs., ECF No. 59 (Ex. 2, Dantzler's Dep. at 15). When she did so, they followed her in without asking for permission to enter. If a jury believed Dantzler's version of events, it could reasonably conclude that she did not manifest consent. Any reasonable observer of the interaction would understand that she stepped back in fear and surprise, rather than because she was consenting to the officers' entry.

Leibas points to cases where consent has been inferred where an individual stepped back and allowed the officers to enter (*United States v. Walls*, 225 F.3d 858, 862-63 (7th Cir. 2000)), gestured for the officers to enter (*United States v. Rosario*, 962 F.2d 733 (7th Cir. 1992); *Griffin*, 530 F.2d at 743), or turned around and walked back into the house (*Harney v. City of Chicago*, 702 F.3d 916, 926 (7th Cir. 2012); *Gerald M.*, 858 F.2d at 384-85). These cases are distinguishable because in none did the officer or officers have their guns drawn. In inferring consent in *Walls*, the Seventh Circuit concluded, "There is simply nothing in the sequence of events that evidences coercion or duress." *Walls*, 225 F.3d at 862. Dantzler, like the homeowners in *Harney* and *Gerald M.*, neither objected to the officers' presence nor otherwise indicated that she had not consented to their presence. This is one factor that suggests her actions objectively manifested consent. However, in *Harney* and *Gerald M.*, the homeowners told the officers that they were going back into the house to get the person that the officers asked for, which suggests some cooperation with the officers consistent with consent to enter. By contrast, Dantzler told the officers she needed to go take care of her crying child, not to get Thompson. In *Gerald M.*, the Seventh Circuit concluded that an individual's walk back into her home manifested consent, because the homeowner "did not act astonished nor . . . physically respond in any way that might

relay the message she disapproved of [the officer's] movement." *Gerald M.*, 858 F.2d at 385. That is different from stepping back in shock, and then asking to go take care of a crying child in another room.

Viewing the evidence in the light most favorable to Dantzler, the court cannot conclude that her actions manifested consent as a matter of law. Leibas has not made a showing that no reasonable juror could return a verdict for Dantzler with respect to whether she impliedly consented to Leibas's entry into her home.

2. Coercion

Whether consent was coerced "is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227. The court should apply "the most careful scrutiny" to consent searches. *Id*. at 229. "Where there is coercion there cannot be consent." *Bumper v. N. Carolina*, 391 U.S. 543, 550 (1968). Consent obtained though "official intimidation or harassment is not consent at all. Citizens do not forfeit their constitutional rights when they are coerced to comply with a request that they would prefer to refuse." *Florida v. Bostick*, 501 U.S. 429, 438 (1991). Under Seventh Circuit precedent, no single factor is determinative of whether consent was voluntary. *Griffin*, 530 F.2d at 743. In determining whether consent was voluntarily given, some of the relevant factors to consider are:

> (1) the person's age, intelligence, and education, (2) whether he was advised of his constitutional rights, (3) how long he was detained before he gave his consent, (4) whether his consent was immediate, or was prompted by repeated requests by the authorities, (5) whether any physical coercion was used, and (6) whether the individual was in police custody when he gave his consent.

*United States v. Raibley*, 243 F.3d 1069, 1075-76 (7th Cir. 2001). The element of physical coercion includes whether there was a show of force by the officers. *Villegas*, 388 F.3d at 326

n.4. "[I]n determining the voluntariness of a consent, the 'psychological atmosphere' in which it is obtained is of critical importance." *Griffin*, 530 F.2d at 743.

If a jury were to believe Dantzler's version of the controverted facts, they would be able to find that any consent was coerced, as the Seventh Circuit did in a very similar case:

> The circumstances surrounding the officers' entry into the Gillespie home indicate that any consent could not have been freely and voluntarily given. Five FBI agents and Gary police officers arrived at Gillespie's door armed with shotguns and revolvers, while three or four other officers maintained a visible position outside to catch any fugitives who might attempt to flee the house. When Gillespie answered the door, the officers identified themselves and told him they were looking for three fugitives who they had been informed were hiding in his home. It is unclear from the record whether the lead FBI agent was already inside the door when Gillespie said the officers could look for the fugitives, but even if the agent were outside, Gillespie could only have felt he had no choice but to let in the officers. As noted, they were heavily armed, and they carried their weapons in a "ready" position.

*United States v. Gillespie*, 650 F.2d 127, 128-29 (7th Cir. 1981) (internal citation omitted). Leibas's motion for summary judgment on the grounds that Dantzler's actions manifested voluntary consent is therefore denied.

### 3. Qualified Immunity

Finally, Leibas argues that he is entitled to qualified immunity. Police officers are entitled to qualified immunity if "it was not clearly established at the time of the [officers' action] that their conduct was unconstitutional." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotation and citation omitted). A "law enforcement officer who participates in a search that violates the Fourth Amendment may [not] be held personally liable for money damages if a reasonable officer could have believed that the search comported with the Fourth Amendment." *Anderson v. Creighton*, 483 U.S. 635, 636-37 (1987). "Although

qualified immunity is an affirmative defense, the burden of defeating an assertion of qualified immunity rests with the plaintiff." *Sparing v. Vill. of Olympia Fields*, 266 F.3d 684, 687-88 (7th Cir. 2001).

In light of *Jimeno* and *Schneckloth*, it was clearly established that an individual manifests consent to search only if an objective observer would understand the actions to mean consent, and that the consent must be voluntary, considering the totality of the circumstances. In *Gillespie*, which has facts consistent with Dantzler's testimony, the Seventh Circuit held that the presence of a large number of officers at one's door, with their guns drawn, vitiated even explicit verbal consent. The facts, viewed in Dantzler's favor at this stage, are even stronger here, where Leibas testified that he asked Dantzler twice to allow him to enter, and where Dantzler testified that she did not verbally consent. If Dantzler's version of the contested facts is true, no reasonable officer would have believed that any consent was voluntarily given, explicitly or implicitly. The motion for summary judgment on the grounds of qualified immunity is therefore denied.

### B. Seizure

Leibas argues that the seizure of Dantzler was reasonable first to ensure the officers' safety while they searched for Thompson and then because the officers had probable cause to arrest Dantzler for the drugs allegedly found in the basement. Both of these justifications rest on the legality of Leibas's presence in Dantzler's home. Since Dantzler has offered evidence that would allow a jury to conclude that the officers' entry was unconstitutional, the issue of seizure must also go to trial.

### IV. CONCLUSION

The court denies the motion for summary judgment.

ENTER:

          /s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: February 21, 2013